NO.: 5:14-CV-44-FL

| | | |
|---|---|---|
| MICHAEL A. SPIVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER AND MEMORANDUM |
| v. | ) | AND RECOMMENDATION |
| | ) | |
| RESEARCH TRIANGLE REGIONAL | ) | |
| PUBLIC TRANSPORTATION | ) | |
| AUTHORITY d//b/a TRIANGLE TRANSIT, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on Defendant's motion for summary judgment [DE-19] and Defendant's motion to strike [DE-31]. All responsive briefing relating to summary judgment is complete; Plaintiff has not responded to Defendant's motion to strike and the time for doing so has expired. All matters raised in these motions are ripe for disposition. Defendant's motion to strike is to be determined by the undersigned in accordance with 28 U.S.C. § 636(b)(1)(A). *See* Local Civil Rule 72.3(b). As it relates to the motion for summary judgment, the parties have not consented to the jurisdiction of the magistrate judge; therefore, Defendant's motion is considered here as a recommendation to the District Court. *See* 28 U.S.C. § 636(b)(1)(B); *see also* Local Civil Rule 72.3(c). For the reasons set forth below, Defendant's motion to strike [DE-31] is ALLOWED and it is RECOMMENDED that Defendant's motion for summary judgment [DE-19] be ALLOWED.

## I. STATEMENT OF THE CASE

On or about December 23, 2013, Plaintiff Michael A. Spivey ("Plaintiff") filed a summons and complaint in the Superior Court of Wake County, raising federal and state law claims related to

the termination of his employment with Defendant Research Triangle Regional Public Transportation Authority d/b/a Triangle Transit ("Defendant"). [DE-1-1]. In sum, Plaintiff alleges he was discriminated against in violation of the Americans with Disabilities Act ("ADA") and the North Carolina Persons with Disabilities Protection Act ("NCPDPA") when his requests for a reasonable accommodation related to his Post-Traumatic Stress Disorder ("PTSD") were denied, and he was retaliated against and ultimately terminated from employment.[1] *See* Compl. ¶¶ 7-32. Defendant removed the action to federal court pursuant to 28 U.S.C. § 1441. [DE-1]. On October 27, 2014, Defendant moved for summary judgment on Plaintiff's claims, to which Plaintiff responded[2] and Defendant replied. [DE-19, -20, -27-29]. On January 30, 2015, without obtaining leave of court, Plaintiff filed a surreply to Defendant's motion for summary judgment. [DE-30]. Defendant subsequently filed a motion to strike Plaintiff's surreply to which Plaintiff did not respond. [DE-31].

## II. STATEMENT OF FACTS

### A.    Background

Defendant operates regional bus and shuttle service, para-transit services, and other transit-related services in the Raleigh-Durham-Chapel Hill area. Decl. of Tellis Chandler ("Chandler Decl.") [DE-19-3] ¶ 2; Decl. of Laurie Barrett ("Barrett Decl.") [DE-19-5] ¶ 2. Defendant employed

---

[1] In the jurisdictional statement of the complaint, Plaintiff alleges that the court has jurisdiction over this action pursuant to Title VII, the Genetic Information Nondiscrimination Act or the Age Discrimination in Employment Act. Compl. ¶ 5. However, Plaintiff's complaint contains no factual allegations to support any such causes of action and Plaintiff has made clear that his claims relate to an alleged disability. Spivey Dep. [DE-19-1] pp. 23:9-13, 73:10-25, 74:1-4; *Id.* [DE-29-1] 171:3-10; Charge of Discrimination [DE-28-1] at 46; Pl.'s Mem. [DE-28] at 1-2.

[2] Plaintiff filed a Response to Motion for Summary Judgment [DE-27] ("Pl.'s Resp."), followed by his Memorandum in Support of Plaintiff's Opposition to Dismiss Defendant's Motion for Summary Judgment [DE-28] ("Pl.'s Mem.").

2

Plaintiff as a bus operator from June 16, 2008 until May 7, 2013. Spivey Dep. [DE-19-1][3] p. 153:2-4; Chandler Decl. ¶ 2.

### B. Plaintiff's Driving Incidents

All bus operators are trained to anticipate potential hazards while driving and are expected to practice defensive driving techniques. Chandler Decl., Ex. H. Defendant also maintains Departmental Work Rules and Procedures applicable to its bus drivers which characterize incidents as either "preventable" or "non-preventable." Spivey Dep. p. 42; Chandler Decl. ¶ 3. An incident is deemed to be preventable if an investigation reveals that the driver was a contributing factor to the incident. Chandler Decl. ¶ 3. A driver who accumulates three preventable incidents in a twenty-four month period may be subject to immediate termination. *Id.* A single preventable incident excludes the driver from receiving a safety bonus for the year in which the incident occurred. *Id.*

In 2009, Plaintiff was involved in two incidents involving the operation of his bus. The first occurred on August 10, 2009, when Plaintiff applied the brakes on his bus to avoid a potential collision with a fire truck exiting a fire station. *Id.* ¶ 4, Ex. A. As Plaintiff applied the brakes a passenger lost her balance and was thrown onto the floor of the bus, sliding on the floor and bumping her head and arms. *Id.* This incident was determined to be non-preventable. *Id.* ¶ 4. On September 8, 2009, Plaintiff was involved in a second incident. *Id.* ¶ 5. A bus passenger contacted Defendant and stated that she had fallen out of her seat and injured her knee when Plaintiff applied the brakes at an intersection. *Id.* This incident was also determined to be non-preventable. *Id.*, Ex. C. Plaintiff received no discipline as a result of these preventable incidents. Spivey Dep. p. 42:20-22.

---

[3] All citations to Plaintiff's deposition refer to those deposition excerpts contained in [DE-19-1] unless otherwise indicated.

On January 7, 2011, Plaintiff was involved in an incident as he approached an intersection while the traffic light was changing. *Id.* p. 57:3-10, Ex. 8; Chandler Decl. ¶ 7. Plaintiff "started braking, chop and padding, if you want to call it that – stabbing . . . [to] keep from hitting the brakes too hard . . . ." Spivey Dep. p. 57:9-13, Ex. 8. As Plaintiff applied the brakes, a passenger sitting in the first front-facing (transverse) seat hit her knee on an exposed bolt on the armrest bar of a seat. Chandler Decl. ¶ 7, Ex. D; Spivey Dep. p. 57:16-20. Plaintiff's supervisor, Michael Rossiter, determined the incident was preventable. Chandler Decl. ¶ 8, Ex. E. Plaintiff objected to the characterization of the incident as preventable because the exposed bolt did not have any protective padding, which Plaintiff believed was a hazard, and also because he thought there may have been an issue with the anti-lock braking system ("ABS"). Spivey Dep. p. 67, Ex. 10. In a letter to Rossiter noting his objection, Plaintiff stated that "preventable measures should have been taken, it should have been preventable during procurement inspection." *Id.*, Ex. 10; Chandler Decl., Ex. F. According to the letter, Plaintiff reviewed the Standard Bus Procurement Guidelines and identified safety hazards in the area of the incident. *Id.* Plaintiff stated there was an absence of padding or other protection on the armrest and that sharp protrusions that are a safety hazard should be covered or padded. *Id.*

As Defendant's Operations Manager, Chandler spoke to Plaintiff about his concerns. Chandler Decl. ¶ 8. Chandler also consulted the maintenance department who assured Chandler that the ABS lights functioned as designed. *Id.* Maintenance also added padding to the armrest on some of the buses. Spivey Dep. pp. 59-60:9; Chandler Decl. ¶ 8. Plaintiff subsequently raised the issue of seat configuration and the absence of a modesty panel or barrier in front of the first transverse seat behind the driver. Chandler Decl. ¶ 9. It appeared to Chandler that Plaintiff was trying to find a

4

reason to reclassify the January incident as non-preventable and that he should not have been held responsible if a modesty panel would have prevented the incident. *Id.*

Training co-ordinator Tammy Romain looked into the January 7 incident. She noted Plaintiff's "suggestions that modifications be made to the bus" regarding the incident and "that adding a modesty panel will help prevent passengers from injuries." *Id.* ¶ 11, Ex. H. Romain determined that even if a modesty panel were installed it would have only resulted in a different type of injury to the passenger. *Id.*

Chandler also reviewed the investigation of the January 7, 2011 incident. *Id.* ¶ 11. There was no in-bus video available and Chandler reviewed witness accounts which were not consistent. *Id.* Based on the differing witness accounts and the lack of video, Chandler determined the evidence was inconclusive and he recharacterised the incident as non-preventable. *Id.*, Ex. I. Chandler informed Plaintiff of this determination in a memorandum dated January 27, 2011. *Id.*[4]

### C. Plaintiff's Accommodation Request

In May and June 2011, Plaintiff compiled a packet of documentation (the "packet") with the subject line "Equal Protection and Duty of Care." Spivey Dep., Exs. 12 and 13.[5] Chandler received the packet from Plaintiff dated May 20, 2011, with a revised cover latter dated June 22, 2011. Chandler Decl. ¶ 10. The following statements are made within the cover letter:

---

[4] Plaintiff responded to Chandler's memorandum in a letter dated July 3, 2011. Chandler Decl. ¶ 12, Ex. J; Spivey Dep., Ex. 15. Plaintiff indicates in his letter that his objective in raising a concern was about safety rather than reversing the determination. Chandler Decl., Ex. J; Spivey Dep., Ex. 15. Plaintiff did not mention any alleged disability to Chandler in any of their conversations. Chandler Decl. ¶ 9.

[5] The same packet of information was presented with two different cover letters. Spivey Dep. 82:4-19, Exs. 12 and 13. The first cover letter dated May 20, 2011 and signed June 2, 2011 is addressed to Janet Carter, Senior Manager of Human Resources. *Id.*, Ex. 12. The second cover letter is addressed to "Recipients of Package" and is dated June 22, 2011. *Id.*, Ex. 13.

5

I was informed that I am disqualified for my safety incentive for 2011, but I am more concerned about the safety issue at hand unresolved! The following information is intended NOT to point fingers, but to find a solution for all parties that may be affected. Because of this continuing issue for equal protection, passengers sitting in the front areas of the Gillig's,[6] will have serious injuries depending on the position of impact to the vehicle. I have thought about this letter for sometime, sleeping with the reminder of the incident on 8-10-09 when a sleeping passenger was thrown (photo #1) 15 feet from her seat with no protection to the front of the bus during an emergency stop! . . . While at **procurement**, if the entire passenger safety areas were made a concern, instead of the industry promoting seating capacity for lower floor vehicles, passengers would have the same equal protection. . . . **Equal protection** not only covers the passengers, it protects the **operator** from having to worry about looking up in the mirror when they should be focusing on the front and side more instead when attempting to slow down! The front left seated area has to be a main part of his or her **equation**, when sometimes, because of unexpected events that may occur making it very difficult to focus on one area or the other. **I can still remember the sound of Janice Hayes hitting the floor and watching her slide until she hit, her head against the GFI and front door of the bus motionless.** During that time, this should have fully been address; video footage reviewed of the incident that happen. When this is resolved, an **Equal Protection** will be in place!

    . . . .

## SUMMATION

The current accident/incident **1-7-2011 was** handled poorly, . . . a road supervisor should have come to the scene, but it seems that it was only an incident since no investigation took place at the scene! Once again, the area of concern is in the exact location of the others listed in the complaint. Leaving this area for future problems, will always place pressure on the operators without a correction made to the area of interest. **Padding has been placed over the arm on the longitude seat steel bar after 1-23-2011(photo # 7 & 8) for protection of the passenger knees! This still does not answer the greatest concern, that no modesty panel or barrier is there to protect the passengers on the left side front seat as there is on the right side of the 2800 series Gillig's. . . . On the 2000 and 2900 series (photo # 6) there is no protection for either front seat occupant in case of rear-ending, . . . My greatest concern is Safety for all parties; the operators are safer to Serve with less stress in this area, knowing that their passengers are safe in an event not from normal driving conditions. I hope that this letter finds its way for a complete REVIEW, of the concerns and that changes are made, we are obligated to serve with a DUTY OF CARE!**

---

[6] Gillig is the name of the bus manufacturer. Barrett Decl. ¶ 5, Ex. A.

*Id.*, Ex. G (emphasis in original); Spivey Dep., Ex. 13 (emphasis in original).

To Chandler, Plaintiff's letter raised the issue of modesty panels in the context of Plaintiff's concern for passenger safety and failed to mention any alleged disability. Chandler Decl. ¶ 10. Plaintiff testified that nowhere in the packet does it indicate Plaintiff has a disability. Spivey Dep. p. 73:16-18.

Plaintiff provided Chandler with another letter dated July 23, 2011. Chandler Decl. ¶13, Ex. K. Plaintiff begins the letter, "I would first like to apologize for not getting this to you earlier," and states further "I am an American with disabilities and a Veteran with disabilities, **my intent** is to avoid someone from becoming a person with a disability." *Id.*, Ex. K (emphasis in original). The remainder of Plaintiff's letter discusses what occurred during the August 10, 2009 bus incident, the injuries sustained by passengers and the seating configuration on the bus. *Id.* The letter states further:

> I take people [sic] safety seriously, not wanting **anybody injured at any cost. Therefore, I decided to accept that maybe I did slam on [the] brakes! It would support my main complaint that there is no equal protection, with no support area except maybe to grab someone in the area for support if there is someone their**[sic].

*Id.* (emphasis in original). Chandler understood the letter to mean that Plaintiff believed modesty panels were necessary to prevent passengers from being injured, and that Plaintiff was again raising an issue of passenger safety, not requesting a reasonable accommodation for a disability. *Id.* ¶ 13.

During his deposition, Plaintiff testified to his belief that the packet, combined with the statement in his July 23, 2011 letter to Chandler stating that he is an "American with Disabilities and Veteran with Disabilities," was sufficient to place Defendant on notice that he was requesting the

7

installation of modesty panels on Defendant's buses as an accommodation for a disability. *See*

Spivey Dep. pp. 72:13-77:13. Plaintiff testified further:

> Q.   So what is your date that you believe that you contend you first requested an accommodation; what's the date?
>
> A.   That would be the letter when I informed them that I had disabilities.
>
> Q.   When you stated that you were an American with disabilities and veteran with disabilities?
>
> A.   Yup. I would say that officially gave them notice. And like I said, I didn't have to spell it out. All I had to do is just make an inquiry to where I – a area I had a problem and go ahead.
>
> Q.   What was the specific accommodation that you requested?
>
> A.   The only thing I mentioned I talked about was just the barriers.
>
> Q.   And how would that have assisted you in performing your job?
>
> A.   Well, let's go back and look at the incidents. If barriers had been in place, I would have never had any incidents. I have numerous commendation from passengers, so if the barriers would have been in place, I would never have no problem.

*Id.* pp. 157:20-158:16.[7]

Spivey also testified that Defendant knew he was a disabled veteran anyway from Plaintiff's prior requests for Veterans Administration ("VA") leave approved by his supervisors, such that he was not required to give Defendant any more notice than he already had given. *Id.* p. 76:5-11.

---

[7]According to Plaintiff, all he had to do was "just put them on notice that [he] was a veteran that had disabilities. [He] did not have to verbally explain it. All [he] had to do was just make it known that [he] had a disability. It was up to them to take and find out if [he] needed to be treated . . . ." Spivey Dep. p. 73:22-74:2. Plaintiff testified further that he does not "have to put it [his disability] in words," rather, "all [he has] to do is just make the suggestion that there is a problem." *Id.* p. 76.

## D. Plaintiff's Meeting with the Safety Committee and His Ongoing Concern about Seating Configuration

The Triangle Transit Safety Committee is comprised of the heads of Defendant's various departments. Chandler Decl. ¶ 14. The Safety Committee meets on a regular basis to consider safety-related concerns to help ensure Defendant is meeting its safety goals and expectations. *Id.* On September 23, 2011, Plaintiff presented his concerns to the Safety Committee regarding seats without modesty panels located in the wheelchair securement area. *Id.*, Ex. L; Spivey Dep. p. 95:11-21. Notes from the meeting indicate that Plaintiff shared his experiences regarding the bus incidents in which passengers were injured as well as his concerns for passenger safety. Spivey Dep., Ex. 17. The notes indicate the discussion focused on priority seating for the elderly and disabled, and that any modifications made to the buses would affect the safety approval of the buses or be a violation of the safety and manufacturer guidelines. *Id.* There was also a concern expressed about the warranty on the buses if the seating configuration were changed. *Id.*

In a memo dated November 23, 2011, in follow-up to its meeting with Plaintiff, the Safety Committee explained that historical data regarding incidents involving passengers in the seats at issue and the minor nature of alleged injuries did not support the need for modifying the bus seating configuration. Chandler Decl. ¶ 15, Ex. L. Instead, the committee found that administrative controls would be implemented requiring operators to leave the seats in their up positions and to not utilize seats unless the bus was at capacity. *Id.*, Ex. L. The memo indicates further that "recognizing [Plaintiff's] passion for safety," the committee extended him a position on the committee. *Id.* Plaintiff is uncertain whether he received the memo from the Safety Committee, but he

acknowledges he was informed of the plan to use administrative controls. Spivey Dep. pp. 116:2-117:11.

Because Plaintiff had expressed an interest in bus safety and design, Chandler asked Plaintiff to attend the Institute for Transportation Research and Education ("ITRE") seminar being held in Raleigh on or about January 24, 2012, as one of Defendant's representatives. Chandler Decl. ¶16. Following the seminar, on or about February 22, 2012, Plaintiff sent a letter to Nancy Painter, of the Public Transportation Division of the North Carolina Department of Transportation. *Id.*, Ex. M. The letter is in reference to "APTA 2011 pg 184-185, 7/2001 pg 71 and North Carolina Consolidated Procurement Project March 2009 pg 102, Piedmont Authority for Regional Transportation Bus Procurement July 2007 pg 54, 55 & 59-Low Floor." *Id.* In his letter to Painter, Plaintiff indicates that he was invited to the ITRE seminar "because of some issue with the vehicles not having barriers/modesty panels in the priority seating area." *Id.* Plaintiff's letter states further:

> I have great concern because I am an **AMERICAN VETERAN WITH DISABILITIES**, and what I experienced in the pass [sic] has troubled me to seek an inquiry into **NONCOMPLIANCE** with the above mentioned references. The **priority area reflects a discrimination factor**, that the people with disabilities currently do not have adequate protection from slips, slide and falls from those seats because their [sic] is nothing to stop their forward motion! My most disappointment with the seminar was when we were about to conclude, until I spoke up about my concern of the seating, problem! You briefly stated that **barriers** would take away seating capacity, I gave you oral references, you stated to send more information! I think that people with disabilities are tax paying people also, and deserve equal protection in limiting occurrences for accidents. How many people have **fallen, slide or had (near miss falls)** in emergency situations? That area is a part of ADA Guidelines, it has been overlooked and should be address [sic] with respect. Drivers are held accountable for people in their care and I believe that it is unfair for a driver to have that much responsibility. While the **Department of Transportation, Procurement Agency's Management Staff and Safety Officer's, have** not challenged the acceptance of vehicles that are not in **COMPLIANCE** with **APTA** standards or the **North Carolina Consolidated Procurement Project 2009 Guidelines**. I believe that there are many people current and former drivers that have experienced some type of **psychological effect!** Attempting to keep their passengers safe and sometimes not being able to stop in time because of an unexpected situation

10

cold cause great harm. . . . **Safety is my main goal! Safety for mother and child, Safety for elderly, Safety for visually impaired, Safety for physically unstable people and Safety for napping riders!**

*Id.* (emphasis in original). The documentation and materials Plaintiff submitted to Painter include pictures of bus floorplans and guidelines from the American Public Transportation Association ("APTA"), a trade industry without any rule-making or enforcement authority. *Id.* ¶ 16. Defendant's buses are in compliance with both federal and state safety standards. *Id.* Plaintiff provided Chandler a copy of his letter to Painter as well as the included materials on March 23, 2012. *Id.*

Laurie Barrett, then Director of Bus Operations, explained the bus purchasing process as follows:

> Defendant utilizes federal funds to facilitate its bus purchases. As such, all buses were purchased from Gillig, the bus manufacturer at the time, utilizing the state contract. The North Carolina Department of Transportation is responsible for developing the state contract which is submitted to contractors to solicit bids. In turn, those contractors who submit bids must submit proof of compliance with all Federal Motor Vehicle Safety Standards ("FMVSS") and United States Department of Transportation, Federal Transit Administration ("FTA") regulations. Contractors also must submit Bus Testing Certification indicating compliance with FTA testing regulations. The contractor awarded the bid has the state contract for a five (5) year term. The contractor (i.e. bus manufacturer) with the state contract was Gillig at the time of Plaintiff's employment and Defendant purchased buses from Gillig utilizing the state contract during Plaintiff's employment. By purchasing the buses from the state contract, Defendant can be assured that the buses meet all federal safety requirements. Additionally, as a recipient of federal grant money, Defendant is subject to triennial reviews conducted by the FTA. The review includes physical inspection of the buses and review of company documents. The FTA conducted triennial reviews in 2009 and 2012. The final report found no deficiencies in the areas of maintenance, as well as, safety and security. Triangle Transit also received Carolina Star safety recognition from the North Carolina Commissioner of Labor, Cherie Berry, in August 2013. Triangle Transit buses are fully compliant with state and federal safety regulations.

Barrett Decl. ¶ 5, Ex. A. On or about April 2012, Barrett received a packet of documents Plaintiff had submitted to General Manager David King ("King") dated April 15, 2012, with the subject line

"Equal Protection and Duty of Care." *Id.* ¶ 7. It appeared to Barrett that Plaintiff's information raised concerns regarding the Gillig seating configuration and that a modesty panel or barrier should be placed on the left side in front of the final row of transverse seating. *Id.* At Barrett's request, Chandler reviewed data on bus incidents involving seats for the period of 2009-2011. Chandler Decl. ¶ 17. Chandler discovered that the data showed the number of such incidents declined each year. *Id.*, Ex. N. As part of his investigation, Chandler also requested that Maintenance Manager Jimmy Price reach out to Gillig to see whether they had any data regarding the need for modesty panels. *Id.* According to Gillig's response to Price's inquiry, "there is no statistical data to support the mandatory need for modesty panels due to fall injuries," rather, it is up to the particular transportation organization whether to use a modesty panel before the first row of seating in the "ADA area" at the expense of two additional seats. *Id.*, Ex. O. Ultimately, Chandler concluded in a written report to Barrett that Defendant's seat configuration posed an acceptable level of risk. *Id.*, Ex. N. Barrett and Chandler delivered to King their findings that the data collected did not support the need for modesty panels. Barrett Decl. ¶ 8; Chandler Decl. ¶ 17. King agreed with their findings and informed Plaintiff by memo dated May 31, 2012 that the findings failed to support the notion that panels reduce bus injuries. Barrett Decl. ¶ 8, Ex. C.

### E. Plaintiff's Performance Evaluation

Plaintiff was issued a performance evaluation by his supervisor Frances Walker dated October 18, 2011. Spivey Dep. pp. 100-01, Ex. 18. The review covered the period of Plaintiff's employment from June 19, 2010 through June 19, 2011. *Id.*, Ex. 18. Plaintiff received a score of 80 on his evaluation and was described as having a strong working rapport with his co-workers and excellent customer service. *Id.* According to the evaluation however, Plaintiff "is not as open to

12

corrective feedback regarding his performance and comes across in a negative manner when he is in disagreement." *Id.*

Plaintiff contends that his evaluation is retaliatory because it contained a derogatory comment and because the evaluation itself was issued late and should have been issued in June. *Id.* pp. 25:11-23, 31:1-6. Other employees had experienced delays in receiving their performance evaluations although Plaintiff is uncertain whether that occurred at the time of his evaluation. *Id.* p.101:1-17. While Plaintiff received pay raises following the evaluation, according to Plaintiff, he did not receive the maximum pay raise. *Id.* p. 28:11-21. Plaintiff testified that everybody received pay raises, from 1% to 3% or 4%, as long as they did not have any accidents or were not tardy. *Id.* p. 28:18-21. Records show that Plaintiff received a 3% merit increase in his hourly pay in October 2011 and a 5.4% merit increase in July 2012. Decl. of Christy Whittington ("Whittington Decl." [DE-19-4] ¶ 10, Ex. F.

### F. Plaintiff Takes a Medical Leave of Absence

Christy Whittington is Defendant's Human Resources Administrator. *Id.* ¶ 1. As Human Resources Administrator, Whittington is responsible for employee benefits, disability leaves of absence, employee relations, and for the processing of employee terminations. *Id.* ¶ 2. On or about November 7, 2012, Plaintiff's physician submitted medical documentation in support of Plaintiff's request for leave under the Family and Medical Leave Act ("FMLA") and short term disability. *Id.* ¶ 3. The physician statement indicates that Plaintiff suffers from Post-Traumatic Stress Disorder which first appeared in 1988 and that Plaintiff has had the same or similar condition for "years." *Id.*, Ex. A. The physician's statement indicated that Plaintiff was unable to "[d]rive the bus due to anxiety and drowsiness from PTSD, sleep apnea, and psychiatric medication." *Id.* Plaintiff

13

identifies his ADA-qualifying disability as being PTSD, which has caused him to have "sleeping problems," anxiety and makes him depressed. Spivey Dep. p. 23:3-8. Plaintiff testified that the first time he informed Defendant of his PTSD was in November 2012 when his doctor submitted the leave paperwork to Defendant. *Id.* p. 23:14-23.[8] Defendant approved Plaintiff's FMLA and short term disability requests. Whittington Decl. ¶ 3. According to Defendant's leave policy, FMLA leave runs concurrently with short term disability leave. *Id.* ¶ 4, Ex. B; Spivey Dep. p. 153:17-23. Qualified employees are entitled to twenty-six (26) weeks of short term disability leave. Whittington Decl. ¶ 4.

### G. Termination of Plaintiff's Employment

On or about April 25, 2013, Whittington received a fax from Plaintiff requesting that she complete a form in connection with his request to the Department of Veteran Affairs for disability benefits. *Id.* ¶ 5, Ex. C. Whittington spoke with Plaintiff on April 25, 2013. *Id.* ¶ 6. During their conversation, Plaintiff told Whittington that his physician had not released him to return to work and that he did not know when he would be released to work. *Id.*; Spivey Dep. p.153:5-16. Whittington then informed Plaintiff that his FMLA and short term disability would be exhausted on or about May 6, 2013, and that as he was unable to return to work, his employment would be terminated. Whittington Decl. ¶ 6, Ex. D. Plaintiff did not inquire about any other job positions with Defendant nor did he inquire about any light duty positions. Spivey Dep. p.153:5-16. On May 7, 2013, Defendant terminated Plaintiff's employment because he was unable to return to work after his

---

[8] Plaintiff also testified he had spoken to Whittington about a week before in order to learn the steps needed to take leave, and that he "guesses" Whittington knew about his PTSD then. Spivey Dep. p. 23:16-21. Whittington, however, testified by declaration that she had not been made aware of Plaintiff's alleged PTSD prior to receiving the leave documentation from Plaintiff's doctor. Whittington Decl. ¶ 3.

14

FMLA and short term disability expired. Whittington Decl. ¶ 6, Ex. E. Plaintiff has not been cleared to work by his doctor since his employment with Defendant was terminated. Spivey Dep. p.16:9-25.

Thereafter, on September 10, 2013, Plaintiff filed a charge of discrimination with the EEOC alleging disability discrimination and retaliation, and a notice of suit rights was issued to Plaintiff on September 27, 2013. Compl. ¶¶ 27-28; Spivey Dep. p. 156:1-6, Ex. 35. Plaintiff claims his employment was terminated and he was retaliated against in violation of the ADA and that his employer failed to accommodate his disability in violation of the ADA. Plaintiff claims also that Defendant's actions constitute violations of the NCPDPA.

## III. DISCUSSION

### A.    Order on Defendant's Motion to Strike

On January 13, 2015, Defendant filed its Reply memorandum in support of its motion for summary judgment. [DE-29]. On January 30, 2015, without seeking leave of court, Plaintiff filed a twenty page document entitled "Plaintiff's Reply in Support of Dismissal of Defendant's Motion for Summary Judgment" along with additional deposition transcript excerpts and exhibits responding to Defendant's motion for summary judgment. [DE-30]. Thereafter, Defendant filed a motion to strike the surreply to which Defendant has failed to respond.

Neither the Federal Rules of Civil Procedure nor this court's local rules of procedure provides for the filing of surreply briefs. *Ivanova-Nikolova v. East Carolina University*, No. 4:08-CV-209-BR, 2011 WL 2462468, at *5 (E.D.N.C. June 17, 2011) (unpublished) (citing Local Civil Rule 7.1 (proper motion practice consists only of a motion and an accompanying supporting memorandum, a response, and a reply, and reply briefs are discouraged); *Freeman v. City of Fayetteville*, 971 F. Supp. 971, 973 n.1 (E.D.N.C. 1997) ("The Local Rules of this court do not allow

for the submission of surreplies.")). Thus, courts generally allow a party to file a surreply "only when fairness dictates based on new arguments raised in the previous reply." *DiPaulo v. Potter*, 733 F. Supp. 2d 666, 670 (M.D.N.C. 2010); *Estate of Richard Myers ex rel. Myers v. Wal-Mart Stores, Inc.*, No. 5:09-CV-549-FL, 2011 WL 1366459 at *1 n.1 (E.D.N.C. Apr. 11, 2011) (unpublished).

Here, Plaintiff neither asked for leave of court to file his surreply brief, nor has he argued that a surreply brief was necessary under the circumstances of the case, and Plaintiff failed to show that Defendant has presented new material in its reply brief that it had not included in its original summary judgment motion. *See Ivanova-Nikolova*, 2011 WL 2462468, at *5 (striking *pro se* plaintiff's surreply brief). Indeed, having failed to respond to the motion to strike Plaintiff has offered no reason for the court to allow his surreply brief. Accordingly, Defendant's motion to strike is ALLOWED and Plaintiff's surreply brief will not be considered by the court.

## B.  Memorandum and Recommendation on Defendant's Motion for Summary Judgment

### 1.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the nonmoving party then must affirmatively demonstrate, with specific evidence, that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The nonmoving party must come forward with admissible evidence; simply relying on argument will not be sufficient. *See Benjamin v. City*

*of Fayetteville*, No. 5:09-CV-553-FL, 2011 WL 1897443, at *2 n.1 (E.D.N.C. May 18, 2011) (unpublished) ("[P]laintiff appears impermissibly to rely on denials in his memorandum opposing summary judgment to create an issue of material fact.") (citing *Rountree v. Fairfax Cnty. Sch. Bd.*, 933 F.2d 219, 223 (4th Cir. 1991) ("The arguments of counsel, absent any evidence such as sworn affidavits accompanying objections to a motion for summary judgment, fail to meet the evidentiary standard necessary to create a genuine issue of material fact.")), *aff'd sub nom. Benjamin v. Inman*, 451 F. App'x 251 (4th Cir. 2011). The nonmoving party's evidence must be material—only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255 (citation omitted); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when

17

"the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created" and judgment as a matter of law should be denied. *Id.* at 489-90.

### 2. Americans with Disabilities Act

Plaintiff's claims of disability discrimination are to be evaluated under the *McDonnell Douglas* burden-shifting framework.[9] *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995), *as amended* (June 9, 1995), *as amended* (Mar. 14, 2008). Under this scheme, the plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the *prima facie* case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that he has been the victim of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).

### A. Discharge

Plaintiff claims Defendant terminated his employment in violation of the ADA. Compl. ¶¶ 27, 29. To establish a *prima facie* wrongful discharge claim under the ADA, Plaintiff must show

---

[9] Neither party contends nor does the court perceive from the record submitted any direct evidence of discrimination. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999) ("[A]n employee may utilize 'ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue [of discrimination].'").

that (1) he was a qualified individual with a disability, (2) he was discharged, (3) he was fulfilling his employer's legitimate expectations at the time of discharge, and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination. *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012).

The parties have focused their arguments on the reason Defendant has proffered for Plaintiff's discharge. Def's Mem. at 11; Pl.'s Mem. at 15-17. Defendant argues that Plaintiff's discharge was legitimately non-discriminatory when Plaintiff was terminated because he could not return to work following the expiration of his leave in accordance with Defendant's leave policy. Whittington Decl. ¶ 6, Ex. E; Def.'s Mem. at 11; Def.'s Reply at 2-3.

Giving Plaintiff's briefing a liberal understanding, it appears that he challenges Defendant on the grounds that he could in fact return to work, despite his sworn testimony to the contrary. *See* Pl.'s Mem. at 16. Plaintiff refers to a "Certification of Health Care Provider FMLA" and states that "[o]n April 25, 2013, during the conversation that his mental health provider had not released him at that time and did not know. **Would show intended return date June 10, 2013." *Id.* Plaintiff also refers to documents attached to his briefing in arguing that he was able to return to work part-time or on a reduced schedule. *Id.* (citing [DE-28-1] at 47-49). Additionally, Plaintiff argues he was told that he had two weeks of sick leave and that his short-term disability would become effective on the first day of disability, after sick leave is exhausted. *See* Pl.'s Mem. at 17. Plaintiff's evidence in rebuttal to Defendant's proffer consists of argument citing hearsay, unsworn and unverified documents, and contradicts his own sworn testimony that he was never cleared to return to work. *See* Spivey Dep. p.16:19-22 (stating he had not been cleared to return to work since leaving Triangle Transit). Plaintiff's argument is not sufficient to create a material issue of fact for trial. *See*

19

*Benjamin*, 2011 WL 1897443, at *2 n.1 ("[Pro se] Plaintiff disputes many of the following facts. Although plaintiff has submitted a great deal of documentary evidence, . . . he has submitted no affidavits or other evidence which conflicts with these facts. Instead, plaintiff appears impermissibly to rely on denials in his memorandum opposing summary judgment to create an issue of material fact."); *Ramsey v. Toyota Motor Sales, USA, Inc.*, 1995 WL 871835, at *4 n.7 (D. Md. Nov. 7, 1995) (unpublished) ("[Pro se plaintiff's] complete failure to verify the information provided to this Court [in opposition to summary judgment] must be held against him in evaluating this case.").

To the extent Plaintiff supports his claims by arguing that Defendant "cover[ed] up known safety issues and plac[ed] fault on Plaintiff," such a theory is equally unconvincing. Director of Transit Partnerships Laurie Barrett has noted that in 2009, padding was added to seats, in part, to help prevent riders from sliding. Barrett Decl. ¶ 6. This explanation is consistent with Plaintiff's Exhibit E2 discussing the addition of the padding. [DE-28-1] at 17. Plaintiff's exhibit is not evidence of non-compliance; rather, Plaintiff's Exhibits D and D1 support the position that the current bus seating configuration is compliant with safety regulations; not a "cover up" as he alleges. *Id.* at 12-13. The documents demonstrate that "Gillig's configuration complies with federal safety regulations." Ex. D [DE-28-1] at 12.

Finally, Plaintiff's purported correspondence with Nancy Painter of the North Carolina Department of Transportation indicates that the department would address the seating configuration issue in the next specification. Ex. E [DE-28-1] at 18. Defendant has not received any request from any agency or regulatory body to modify or alter its seating configuration and Defendant's buses meet all state and federal safety specifications. Barrett Decl. ¶ 5. Plaintiff's dispute regarding seating compliance fails to create a material question of fact relevant to his claims. Moreover,

20

Plaintiff's unsubstantiated speculation and assertions are insufficient to establish pretext. *See Ennis*, 53 F.3d at 62 ("Mere unsupported speculation . . . is not enough to defeat a summary judgment motion."). There is simply no evidence to support that Defendant's stated reason for Plaintiff's termination was pretextual and that he was terminated to cover-up safety issues. Accordingly, Defendant is entitled to summary judgment on this claim.

B.      Failure to Accommodate

Plaintiff argues that Defendant failed to provide him with a reasonable accommodation of installing modesty barriers within its buses. Spivey Dep. p. 75:2-13. To establish a prima facie case for failure to accommodate under the ADA, an employee must show: (1) he was an individual with a disability within the meaning of the ADA, (2) the employer had notice of his disability, (3) he could perform the essential functions of the position with reasonable accommodation, and (4) the employer refused to make such accommodations. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (citation omitted). An employer is not expected under the ADA to accommodate disabilities of which it is not aware. *See* 29 C.F.R. pt. 1630 app. ("[A]n employer would not be expected to accommodate disabilities of which it is unaware."); *Wilson v. Dollar General Corp.*, 717 F.3d 337, 346-47 (4th Cir. 2013) (discussing employee's duty to put employer on notice of disability); *Adamczyk v. Chief, Baltimore Cnty. Police Dep't*, 952 F. Supp. 259, 264 (D. Md. 1997) ("[A]n employee cannot succeed on a claim of [ADA] discrimination . . . when the employer was not even aware of the employee's disability."). Though the burden to provide notice is "not a great one," and does not require the use of magic phrases, an employee must inform the employer of both the existence of the disability and the "need for the accommodations for that disability." *Rock v. McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011) (quoting *EEOC v. Fed. Express Corp.*, 513 F.3d

21

360, 369 n.5 (4th Cir. 2008) & citing *Schneider v. Giant of Md., LLC*, 389 F. App'x, 263, 270 (4th Cir. 2010) (holding that an employer's knowledge that an employee was diabetic did not equate to notice that the employee's diabetes was so limiting as to be disabling and to require special accommodations)); *see Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 107 (1st Cir. 2007) (observing "[t]hat because an employee's disability and concomitant need for accommodation are often not known to the employer [], the plaintiff has the burden of showing that she sufficiently requested the accommodation in question[], [which] must be sufficiently direct and specific, and must explain how the accommodation requested is linked to some disability) (internal citations and quotations omitted). "[V]ague or conclusory statements revealing an unspecified incapacity are not sufficient" to satisfy this burden. *Rock*, 819 F. Supp. 2d at 473 (quoting *Huppenbauer v. May Dep't Stores Co.*, 99 F.3d 1130, 1996 WL 607087, at *6 (4th Cir. Oct. 23, 1996) (holding that if all of an employee's coworkers knew that he had a heart condition, such knowledge would not amount to notice to the employer that the employee was so limited by a disability as to require special accommodations). "An employer is not required to divine from an observation of a symptom of a disability that an employee actually has a disability." *Valenzic v. Baltimore City Bd. of Sch. Comm'rs*, No. CCB-12-243, 2014 WL 4661456, at *5 (D. Md. Sept. 17, 2014); *Freadman*, 484 F.3d at 104 (explaining the employer has "no duty to divine the need for a special accommodation where the employee fails to make an adequate request.").

None of Plaintiff's communications to Defendant demonstrates that he provided sufficient notice of his disability and need for an accommodation until after he was on leave. Plaintiff did not submit any complaints or concerns to Chandler regarding seating configuration or modesty panels after either 2009 bus incident. Chandler Decl. ¶ 6. Plaintiff's written response to Rossiter regarding

22

the January 7, 2011 incident concerned the exposed bolt on the armrest bar and the ABS system. Spivey Dep., Ex. 10. Plaintiff complained that preventable measures should have been taken to prevent injury to passengers. *Id.* Plaintiff responded to Chandler's re-characterization of the January 2011 incident as non-preventable, stating that his concerns were for safety of passengers. *Id.*, Ex. 15. In the packet Plaintiff provided Defendant in May or June 2011, Plaintiff repeats that he is more concerned about safety than about losing his incentive. *Id.*, Ex.12. Plaintiff's letter makes vague reference to "equal protection" and states generally that if passengers were protected, bus operators would not have to worry about "looking up in the mirror" when their attention should be focused elsewhere. *Id.* Plaintiff states again that his concern is safety for all parties including bus drivers and reducing their stress. *Id.* The notes from the Safety Committee meeting where Plaintiff presented his concerns reveal those concerns to be directed to a perceived risk to passengers from the absence of modesty panels. *Id.*, Ex. 17. Nowhere in these communications does Plaintiff inform Defendant of his disability, request an accommodation, or express how the accommodation is related to his disability. Plaintiff's generalized references to the potential for driver distraction and stress are insufficient to put Defendant on notice of Plaintiff's disability or need for an accommodation. *See Freadman*, 484 F.3d at 107; *Rock*, 819 F. Supp. 2d at 473.

Plaintiff claims that in or about May 2011, he advised Defendant of his "bothersome condition and requested a reasonable accommodation" and that his request was denied. Compl. ¶11. Plaintiff testified the reasonable accommodation he sought was the installation of modesty panels due to his PTSD.[10] Spivey Dep. p 72:11-74:4. Plaintiff testified further that the packet he provided

---

[10] Only contained in Plaintiff's briefing is the relationship between Plaintiff's alleged PTSD and the installation of modesty panels/barriers revealed. *See* Pl.'s Mem. at 13. Plaintiff argues that seeing bus passengers without protection
(continued...)

to his employer, combined with the letter to Chandler, gave Defendant sufficient notice that he was requesting an accommodation. *Id.* Plaintiff also testified however that Defendant already knew of his condition because his supervisors had approved him for VA leave. *Id.* p. 76:5-8. In his brief Plaintiff argues that on three occasions his supervisors approved his requests for leave related to mental health treatment. Pl.'s Mem. at 9. In particular, Plaintiff argues "Bus operations had copies of February 14, 2011, April 18, 2011, and July 24, 2012 with 'MH' appointments." Pl.'s Mem. at 17-18. Plaintiff appears to contend that he submitted doctor's notes to his supervisors indicating he was receiving mental health treatment on dates prior to his submission of the packet regarding modesty panels. Plaintiff's evidence that these requests were submitted and approved is comprised of copies of what appear to be VA Treatment records. Exs. B1, B2, B3 [DE-28-1] at 7-9. However, this evidence only shows Plaintiff received treatment, and Plaintiff has failed to point to record evidence indicating he submitted these records, or any requests for "MH" or mental health leave, to his supervisors. Such unsupported speculation is insufficient to overcome summary judgment. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (noting "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial."). Plaintiff's new allegation that Defendant was put on notice of his disability by his time-off requests for doctor's appointments contradicts his sworn testimony that the packet and letter to Chandler put Defendant on notice of his disability and request for accommodation. Spivey Dep. p. 72:13-74:4. "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by

---

[10](...continued)

reminds him of the marines killed in Beirut, Lebanon because of the lack of barriers, and that seeing passengers unable to protect themselves "caused arousal of PTSD, anxiety, mental anguish and sleep/nightmares." *Id.* This was not contained in Plaintiff's communications to Defendant according to the record the parties provided to the court in relation to the motion for summary judgment.

contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 974-75 (4th Cir. 1990) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of a plaintiffs testimony is correct").

Plaintiff has identified PTSD as the disability that forms the basis of his claims and Plaintiff did not inform Defendant of his PTSD until November 2012, well after his alleged accommodation request. Spivey Dep. p. 153:24-154:7; Whittington Decl. ¶ 3, Ex. A. The undisputed evidence is that Defendant had no knowledge of Plaintiff's alleged PTSD when Plaintiff raised the issue of modesty panels. Plaintiff's reliance on his July 23, 2011 letter to Chandler in which he stated he is an "American with disabilities and veteran with disabilities" is unconvincing. Spivey Dep., Ex. 16; *see also* Chandler Decl. ¶ 16, Ex. M (Feb. 22, 2012 letter stating Plaintiff is an American veteran with disabilities). An employer's general knowledge of a condition is not sufficient to put it on notice that an accommodation is being sought by the employee. *See Schneider*, 389 F. App'x, at 270. Rather, the employer must be aware that the alleged disability bears a relationship to the accommodation requested. *See King v. Blanchard Mach. Co.*, No. 3:10-3219-MBS, 2012 WL 4586177, at *11 (D.S.C. Sept. 28, 2012) (unpublished) (granting summary judgment to defendant on failure to accommodate claim where the plaintiff "never described to Defendant how the request to move workspaces bore any relationship to his anxiety or depression"). Here, the documentation Plaintiff provided to Defendant in support of modesty panels fails to demonstrate a relationship to or the notice of Plaintiff's own disability. *See* Spivey Dep. Ex., 16 ("I am an American with

25

disabilities and a veteran with disabilities, **my intent** is to avoid someone from becoming a person with a disability.") (emphasis in original); Chandler Decl., Ex. M (Plaintiff's letter to Painter mentioning "discrimination" but in the context of conveying general concerns for passenger safety). Accordingly, no reasonable juror could find Defendant had notice of Plaintiff's alleged disability or that he requested an accommodation.

### C. Retaliation

Plaintiff claims he was retaliated against in his employment in violation of the ADA. Compl. ¶29. Under the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter . . . ." 42 U.S.C. § 12203(a). To establish a *prima facie* retaliation claim, Plaintiff must show that (1) he engaged in a protected activity, (2) Defendant took an adverse employment action against him, and (3) there was a causal link between the protected activity and the adverse employment action. *Rhoads*, 257 F.3d at 392 (citing *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 705-07 (4th Cir. 2001); *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). A plaintiff need not establish that the conduct he opposed actually constituted an ADA violation; rather, a complainant must allege the predicate for a reasonable, good faith belief that the behavior he is opposing violates the ADA. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002) (citing *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000)). After the plaintiff establishes a *prima facie* claim, "[t]he employer then has the burden 'to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions.'" *Rhoads*, 257 F.3d at 391 (quoting *Beall*, 130 F.3d at 619). "If the employer does so, the plaintiff 'must demonstrate that the proffered reason is a pre-text for forbidden retaliation.'" *Id.* (quoting *Haulbrook*, 252 F.3d at 706). "The plaintiff always bears the

ultimate burden of persuading the trier of fact that she was the victim of retaliation." *Id.* (citing *Beall*, 130 F.3d at 619).

### i. Protected Activity

According to Plaintiff, the protected activity about which he was retaliated was his request for the installation of modesty panels as a reasonable accommodation.[11] Spivey. Dep. p. 171, Pl.'s Mem. at 21. To show that he was engaged in a protected activity, Plaintiff must show that he held a reasonable, good faith belief that the practice in which he engaged—his request for modesty panels—was a request for a reasonable accommodation, and Defendant's refusal to install them was an unlawful refusal to provide a reasonable accommodation to limitations impaired by his alleged disability. *See Rhoads*, 257 F.3d at 307 n.11; *see also Parkinson v. Anne Arundel Med. Ctr.*, No. 02-2000, 79 F. App'x 602, 604 (4th Cir. Oct. 31, 2003) (unpublished) (refusal to accommodate as a retaliatory act). Plaintiff's belief must be objectively reasonable in light of all the facts. *See Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 340-41 (4th Cir. 2006). However, before Plaintiff may establish that Defendant refused to provide reasonable accommodation in violation of the ADA, Plaintiff "*first* must have, at minimum, communicated to [Defendant] a wish for accommodation of his disability." *See Parkinson*, 79 F. App'x at 604 (citing *Ballard v. Rubin*, 284 F.3d 957, 960-62 (8th Cir. 2002)). For the reasons set forth above detailing Plaintiff's communications to Defendant, Plaintiff could

---

[11] To the extent Plaintiff seeks now to identify FMLA leave and the reporting of alleged safety violations as additional protected activities in which he engaged and about which he was retaliated against, he may not do so through mere argument in his briefs. *See Harris v. Reston Hosp. Center, LLC*, 523 F. App'x 938, 946 (4th Cir. Apr. 24, 2013) (unpublished) ("[C]onstructive amendment of the complaint at summary judgment undermines the complaint's purpose and can thus unfairly prejudice the defendant") (citations omitted). Ultimately, however, these new assertions fail to create a genuine issue of material fact as they contradict Plaintiff's sworn testimony identifying the protected activity in this case as his request for a reasonable accommodation. *See* Spivey Dep. [DE-29-1] p. 171:3-10.

not have reasonably believed that he made clear to Defendant that he was requesting an accommodation and, thus, cannot demonstrate he engaged in protected activity. *Id.* at 604-05.

### ii. Adverse Action

Plaintiff identifies in his deposition the retaliatory act about which he complains is the late issuance of his performance evaluation in October 2011 which contained a derogatory comment. Spivey Dep. pp. 25, 31; Pl.'s Mem. at 24. The review at issue covers the time period of June 19, 2010 through June 19, 2011. Spivey Dep., Ex.18. Plaintiff did not receive the review until on or about October 18, 2011, after the time he made his presentation to the Safety Committee in September. According to Spivey, other bus drivers discussed receiving late evaluations. *Id.* pp.100-01. Plaintiff takes exception to the comment in the review that he was "not as open to corrective feedback regarding his performance and comes across in a negative manner when he is in disagreement." *Id.* p. 100, Ex. 18. Plaintiff also contends he was not provided sufficient explanation for the comment. *Id.* Plaintiff's overall performance score was 80 and the review noted Plaintiff's "strong working rapport with co-workers" as well as his "excellent customer service skills." *Id.*, Ex. 18. While Plaintiff received pay raises following the evaluation, according to Plaintiff, he did not receive the maximum pay raise. *Id.* p. 28. Plaintiff testified that everybody received pay raises, from 1% to 3% or 4%, as long as they did not have any accidents or were not tardy. *Id.* In fact, records show that Plaintiff received a 3% merit increase in his hourly pay in October 2011 and a 5.4% merit increase in July 2012. *See* Whittington Decl. ¶ 10, Ex. F. Plaintiff remained in his position of bus operator until his termination on May 7, 2013. *Id.* ¶ 6.

"In the Fourth Circuit, a negative performance evaluation alone, without any accompanying injury or change in the terms or conditions of employment, is insufficient to constitute a materially

adverse employment action in order to establish a cause of action for retaliation . . . ." *Altman v. McHugh*, No. 5:11cv00061, 2012 WL 1190271, at *17 (W.D. Va. Apr. 9, 2012) (unpublished) (citing *Parsons v. Wynne*, 221 F. App'x 197 (4th Cir. 2007)), *aff'd*, 478 F. App'x 762 (4th Cir. 2012); *Jones v. Dole Food Co., Inc.*, 827 F. Supp. 2d 532, 556 (W.D.N.C. 2011) ("Even *negative* performance evaluations do not qualify where the evaluation does not result in a loss of pay, demotion, or other adverse employment consequences.") (citation omitted), *aff'd*, 473 F. App'x 270 (4th Cir. 2012). To the extent Plaintiff received "only" a 3% pay increase following his review, on its face, such employment action cannot be considered adverse, and Plaintiff admitted "everybody" received pay raises. *See Phillips v. Raytheon Applied Signal Tech., Inc.*, No. ELH-11-3230, 2013 WL 5440802, at *27 (D. Md. Sept. 27, 2013) ("[P]laintiff's claim that she was retaliated against when she received 'only' a 3% raise fails because plaintiff has not offered any evidence to suggest that it was adverse. On its face, a pay increase is not adverse, and plaintiff has not produced any evidence whatsoever to suggest that her 3% pay increase differed in any way from increases received by her co-workers."), *aff'd*, 556 F. App'x (4th Cir. Feb. 25, 2014). Plaintiff has failed to show he suffered an adverse action.

### iii. Causation

An aggrieved plaintiff must produce evidence showing the existence of a causal link between the protected activity and the adverse employment action. *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405-06 (4th Cir. 2005). "[T]he employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity. Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima

facie case." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original) (citation omitted), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006); *see also Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (affirming dismissal of plaintiff's retaliatory harassment claim because he introduced no evidence showing that the defendant knew about his EEO charge). As outlined in the discussion above, Plaintiff failed to provide notice of his accommodation request to Defendant. To the extent Plaintiff now contends that Defendant's failure to offer him part-time work or a reduced schedule establishes causation, Pl.'s Mem. at 25, this argument contradicts Plaintiff's testimony that he has not been medically cleared to return to work and fails to create a genuine material issue of fact for trial. Spivey Dep. p. 16:9-25; *see Cleveland*, 526 U.S. at 806 (holding that a party cannot create a genuine issue of fact simply by contradicting his or her own previous sworn statement without explanation or resolving the contradiction). Furthermore, there is no evidence Plaintiff communicated to Defendant that he could work a reduced schedule. Whittington Decl. ¶ 6. Because Defendant had no knowledge of Plaintiff's alleged "protected activity," Plaintiff cannot show the requisite causal link to prove retaliation.

### iv. Time-Bar

Finally, the retaliatory act about which Plaintiff complains is time-barred. To file a claim under the ADA in federal court, a plaintiff must first exhaust his administrative remedies by filing a timely charge of discrimination with the EEOC within 180 days of the alleged discriminatory. *See* 42 U.S.C. § 2000e-5(e); 42 U.S.C. § 12117(a). Failure to timely file a charge with the EEOC bars the claim in federal court. *Delaware State College v. Ricks*, 449 U.S. 250, 262 (1980), *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Courts have strictly enforced this

requirement. *Fulmore v. City of Greensboro*, 834 F. Supp. 2d 396, 411 (M.D.N.C. 2011) (citations omitted). Here, Plaintiff's claim of retaliation concerns a discrete act of discrimination. *See Morgan*, 536 U.S. at 114 ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). As such, the act of discrimination or retaliation occurs on the day it happened for purposes of calculating the 180-day period. *Id.* at 110. Plaintiff received his performance review in October 2011. Spivey Dep., Ex. 18. However, Plaintiff did not file his charge of discrimination until September 10, 2013, well beyond 180 days. Compl. ¶ 28. Plaintiff's claim of retaliation is therefore time-barred.

> 3.     The North Carolina Persons with Disabilities Protection Act

Plaintiff asserts a claim of discrimination in violation of the NCPDPA, N. C. Gen. Stat. § 168A-1 *et seq.* Compl. ¶¶ 5, 7, 31-32. The NCPDPA creates a cause of action for a person with a disability who is aggrieved by a discriminatory practice as defined in the act. *Id.* § 168A–11(a). Among other things, it is a discriminatory practice for an employer to discharge or otherwise discriminate against a qualified person with a disability on the basis of a disabling condition with respect to terms and conditions of their employment. *Id.* § 168A-5(a)(1). Claims under the NCPDPA, however, are limited in that

> [n]o court shall have jurisdiction over an action filed under this Chapter where the plaintiff has commenced federal judicial or administrative proceedings under . . . the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended, or federal regulations promulgated under that Act, involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under this Chapter.

*Id.* § 168A–11(c). Courts will thus dismiss claims under the NCPDPA when they arise out of the same facts as a claim under the ADA. *Sheaffer v. Cnty. of Chatham*, 337 F. Supp. 2d 709, 734 (M.D.N.C. 2004); *Cone ex rel. Cone v. Randolph Cnty. Sch.*, 302 F. Supp. 2d 500, 514 (M.D.N.C.

31

2004), *aff'd,* 103 F. App'x 731 (4th Cir. July 16, 2004). Since Plaintiff's claim under the NCPDPA arises out of the same facts and circumstances involved in his ADA claim, it fails as a matter of law and summary judgment should be allowed. *See Sheaffer,* 337 F. Supp. 2d at 734.

## IV.  CONCLUSION

For the foregoing reasons IT IS ORDERED that Defendant's motion to strike [DE-31] is ALLOWED and IT IS RECOMMENDED that Defendant's motion for summary judgment [DE-19] be ALLOWED.

IT IS DIRECTED FURTHER that a copy of this Order and Memorandum and Recommendation be served on the respective parties or, if represented, their counsel.  Each party shall have until **August 27, 2015** to file with the District Court (1) an appeal of the Order and/or (2) written objections to the Memorandum and Recommendation.  The presiding judge shall consider any appeal of the Magistrate Judge's Order and shall set aside any portion of the Order found to be clearly erroneous or contrary to the law.  28 U.S.C. § 636(b)(1)(A); Local Civil Rule 72.4(a). The District Judge may also reconsider *sua sponte* any matters determined by the Magistrate Judge's Order.  The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.,* 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b).

**If a party fails to appeal the Magistrate Judge's Order to the presiding judge by the foregoing deadline, the presiding judge may deny the appeal without further consideration.**

If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins,* 766 F.2d 841, 846-47 (4th Cir. 1985).

Any response to objections shall be filed within 14 days of the filing of the objections.

Submitted, the 10th day of August 2015.

Robert B. Jones, Jr.
United States Magistrate Judge